IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| VINCENT PERRY and | ) | Case No. 10-07289-TOM-7 |
| MARIA WELLMAN PERRY, | ) | |
| | ) | |
| Debtors. | ) | |

| | | |
|---|---|---|
| MARIA WELLMAN PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | A.P. No. 13-00023-TOM |
| vs. | ) | |
| | ) | |
| CITY OF BIRMINGHAM, ALABAMA | ) | |
| LAW DEPARTMENT | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This adversary proceeding came before the Court on July 23, 2014, for trial on the complaint to determine dischargeability of a debt filed by Dr. Maria Wellman Perry. Appearing before the Court were Debtor/Plaintiff Dr. Maria Wellman Perry; Oscar W. Adams, III, counsel for Dr. Perry; Sheryl Walker, Senior Auditor for Defendant City of Birmingham, Alabama; and Yolanda Y. Lawson Hunter and Brian Kilgore, counsel for City of Birmingham. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a) and the District Court's General Order Of Reference Dated July 16, 1984, As Amended July 17, 1984.[1] This is a core proceeding arising under

---

[1] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:

> The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(I).[2] This Court has considered the pleadings, arguments, evidence, testimony, and the law, and finds and concludes as follows.[3]

## FINDINGS OF FACTS[4]

The Plaintiff, Dr. Maria Wellman Perry, known professionally as Dr. Maria Wellman, testified that she is a physician who had a medical practice in the city of Birmingham, Alabama (the "City") until she closed it in July 2011 due to health and financial reasons. Dr. Perry brought this adversary proceeding asking the Court for a determination that the debt she owed to the City for business license and occupational taxes were discharged in her bankruptcy case. Dr. Perry also seeks an award of sanctions against the City for its attempts to collect the debt.

Dr. Perry filed her bankruptcy case under Chapter 13 on December 10, 2010, and converted the case to Chapter 7 on October 21, 2011. It is undisputed that she did not include the City in her schedules filed along with her bankruptcy petition. She testified that she does not remember if the City was included when she provided her bankruptcy counsel with information about her debts. Although Dr. Perry testified that she amended her schedules to include the City when she converted

---

[2] 28 U.S.C. §157(b)(2)(I) provides as follows:

(b)(2)Core proceedings include, but are not limited to–
(I) determinations as to the dischargeability of particular debts[.]

[3] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[4] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

2

her bankruptcy case to Chapter 7, the City was not added until November 16, 2011, when Dr. Perry filed Amended Schedule E reflecting an unsecured priority claim owed to "City of Birmingham, Revenue Division, Room TL-100 City Hall, 700 North 20th St., Birmingham, AL 35203." Plaintiff's Exhibit 1, Amended Schedule E.

The City filed a complaint against Dr. Perry in the Circuit Court of Jefferson County, Alabama on November 14, 2012, alleging that Dr. Perry owed, inclusive of penalties and interest, business license taxes in the amount of $46,461.50 and occupational taxes in the amount of $1,054.66, and requesting, among other things, that the court enjoin Dr. Perry from engaging in business until she paid the delinquency. Plaintiff's Exhibit 9, Summons and Complaint and Motion for Preliminary Injunction. According to Dr. Perry, she did not learn that the City had filed a lawsuit against her until sometime after February 27, 2012, the date she received her Chapter 7 discharge. Dr. Perry testified that the City attempted to serve her with the complaint at her place of employment by leaving the complaint with the receptionist, who forwarded it to Dr. Perry's supervisor, who in turn gave it to her, resulting in her embarrassment. Dr. Perry also testified that, post-discharge, the City filed a motion in the state court case to serve her with the complaint by publication.[5]

Sheryl Walker, Senior Auditor for the City of Birmingham, testified on behalf of the City. Ms. Walker testified that Dr. Perry applied for her first business license with the City in 1987. According to Ms. Walker, Dr. Perry had in years past become delinquent on business license and occupational taxes but had caught up the delinquencies and closed her account with the City in 2005. Ms. Walker testified that in October 2005 Dr. Perry reactivated the account by completing an

---

[5] The testimony and evidence Dr. Perry presented at trial addressed only the sanctions issue. No evidence was presented with regard to the dischargeability of the debt.

application for tax certificate and mailing it to the City. Ms. Walker further testified that Dr. Perry was not required to send any payment along with her application. She explained that upon receipt of Dr. Perry's application on October 7, 2005, the City mailed her a "notice of business license" indicating the initial cost of the license. Ms. Walker testified that upon payment of the amount indicated in the notice the City would issue a business license to Dr. Perry; however, the business license was never issued because Dr. Perry never paid the amount billed. Ms. Walker stated that $60 is the initial cost of a business license, and after 90 days of operations the cost of the license would be projected based on gross receipts during the 90 day period. In subsequent years the cost of the business license would be based on gross receipts from the previous year. Ms. Walker also explained that an employer is required to withhold occupational taxes from employees' salaries in the amount of 1% of an employee's gross compensation, then remit the taxes to the City on a monthly basis. Ms. Walker testified that Dr. Perry has not paid any amount toward the cost of a business license from the time she reactivated her account with the City in October 2005, but she has paid some occupational taxes.

  Ms. Walker testified that the City sent notices and correspondence to Dr. Perry in 2011 and that she does not recall that Dr. Perry responded. She further testified that a revenue examiner attempted a "field visit" or "site visit" to Dr. Perry's place of business on at least one occasion but was informed that Dr. Perry moved her practice. According to Ms. Walker the City made a preliminary assessment of business license and occupational taxes due from Dr. Perry on February 3, 2012, and per City ordinances Dr. Perry could have filed an appeal of the assessment within 30 days; however, Dr. Perry did not do so. The City then made a final assessment of the amount due which was mailed to Dr. Perry on May 18, 2012.

According to Ms. Walker, on July 6, 2012, the City sent Dr. Perry a notice by certified mail regarding its intent to proceed with collection of the assessed business license and occupational taxes, and that Vincent Perry, Dr. Perry's husband, signed the certified mail receipt. The notice reflects that the total amount of taxes, interest, penalties, and fees owed by Dr. Perry was $47,516.16 as of May 18, 2012; $46,461.50 of the amount represents business licenses due for 2007 - 2011, and the remainder of $1,054.66 represents occupational taxes due for October 2011 through December 2011. *See* Defendant's Exhibit 4, Letter dated July 6, 2012. Ms. Walker testified that the notice provided a date by which Dr. Perry should respond, and that no response was received. Ms. Walker stated that the City filed a notice of municipal tax lien against Dr. Perry on November 9, 2012, and the same was sent to Dr. Perry via certified mail on November 13, 2012.

Ms. Walker testified that Dr. Perry had not filed returns with the City and therefore the total assessment of $47,516.16 due in taxes, interest, and penalties had been based on estimates. She further testified that when Dr. Perry provided her IRS transcripts to the City, that allowed the City to adjust the total taxes, interest and penalties attributable to her business license to $16,608.53, and the total attributable to occupational tax to $802.96 as of June 2014 (just before the trial of this adversary proceeding). According to Ms. Walker, the $16,608.53 amount is comprised of $9,137.22 business license taxes, $4,784.40 interest, and $2,686.90 penalties. The entire amount due relating to occupational taxes consists of penalties for not timely filing returns.

Ms. Walker further testified that counsel for Dr. Perry called in June 2012 to inform the City that the taxes the City was attempting to collect were discharged in bankruptcy in February 2012. According to Ms. Walker, counsel did not provide a case number. Ms. Walker testified that prior to the phone call the City had not received any notice of Dr. Perry's bankruptcy. She further testified

5

that by the time Dr. Perry's counsel made the phone call, the City had already "converted" the file to a civil action. Ms. Walker stressed that the City never received "formal" notice, or in other words, anything in writing from the bankruptcy court regarding Dr. Perry's bankruptcy or discharge. Ms. Walker testified that the City's tax and revenue department's mailing address is 710 North 20th Street, not 700 North 20th Street as listed on Dr. Perry's amended Schedule E filed November 16, 2011. Ms. Walker opined that the City complied with the City ordinances and the Alabama Code with its treatment of Dr. Perry's case, and stated the City took the normal course of action it would have taken against any delinquent taxpayer in the absence of "formal" or written notice of a bankruptcy filing.

## CONCLUSIONS OF LAW

Dr. Perry seeks a determination that the business license taxes and occupational taxes assessed against her by the City were discharged when she received her Chapter 7 discharge on February 27, 2012, as well as an award of sanctions against the City for attempting to collect the debt post discharge.

## I. TAXES

Dr. Perry contends in her complaint that she listed the City as a creditor in her bankruptcy case "for unpaid city licenses" and contends that she "owe[s] no taxes, withholding or otherwise" to the City because the debt was discharged in her bankruptcy case. As set forth in Bankruptcy Code Section 523, certain taxes are excepted from discharge:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
> (1) for a tax or a customs duty--
> (A) of the kind and for the periods specified in section 507(a)(3) or 507(a)(8) of this title, whether or not a claim for such tax was filed or allowed;

6

>    (B) with respect to which a return, or equivalent report or notice, if required--
>       (i) was not filed or given; or
>       (ii) was filed or given after the date on which such return, report, or notice was last due, under applicable law or under any extension, and after two years before the date of the filing of the petition; or
>    (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax[.]

11 U.S.C. § 523(a)(1). "Tax" is not defined in the Bankruptcy Code. *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 220, 116 S. Ct. 2106, 2111 (1996). The United States Supreme Court has considered a tax to be "a pecuniary burden laid upon individuals or property for the purpose of supporting the Government" or, phrased differently, "[a] tax is an enforced contribution to provide for the support of government . . . ." *Id.*, 518 U.S. at 224, 116 S. Ct. at 2113 (citations omitted)(alteration in original). "The statute's characterization of the obligation is not controlling. . . . [A] court must look to the substance of the statute to determine whether the obligation bears the characteristics of a tax." *North Dakota Workers Compensation Bureau v. Voightman (In re Voightman)*, 239 B.R. 380, 383 (8th Cir. B.A.P. 1999)(citations omitted). A measure is considered a tax when the enacting statute's purpose is to raise revenue and not to regulate. *St. Clair County Home Builders Assoc. v. City of Pell City*, 61 So. 3d 992, 1003 - 04 (Ala. 2010)(a charge used to generate revenue for the county and not to defray costs of a specific service is a tax); *see also Miami Herald Pub. Co. v. City of Hallandale*, 734 F.2d 666, 670 (11th Cir. 1984) ("[T]o the extent the statute challenged is regulatory rather than revenue raising in purpose, the measure does not constitute a tax . . . .").

Alabama Code section 11-51-90 authorizes municipalities to issue business licenses. This section, found in Chapter 51 ("Taxation") of Title 11 ("Counties and Municipal Corporations"), provides:

> (a) All municipalities shall have the following powers:
> (1) To license any exhibition, trade, business, vocation, occupation, or profession not prohibited by the constitution or laws of the state which may be engaged in or carried on in the municipality.
> (2) To fix the amount of licenses, the time for which they are to run, not exceeding one license year, to provide a penalty for doing business without a license, and to charge a fee not exceeding [amount to be adjusted every five years] for issuing each license. . . .
> (3) To establish a minimum, and in the discretion of the municipality, a maximum business license, with the amount of the minimum and, if appropriate, maximum business license and the applicable tax rate for each category to be established from time to time by the governing body of each municipality pursuant to this chapter.

Alabama Code § 11-51-90.

Pursuant to the authority of the statute the City has adopted a Business License Code identifying who must obtain a business license and the procedure for doing so. The Business License Code dictates how the cost of a license is determined, which, in the case of physicians, is calculated based on gross receipts from professional services rendered the prior year. Birmingham, Ala. Business License Code, art. I, § 1, schedule 198 (2009), *available at* http://www.birminghamal.gov/?s=tax+code (follow "Business Tax Codes" hyperlink). Throughout the Business License Code the amounts to be collected pursuant to its provisions are referred to as "taxes" or "license taxes." The Business License Code instructs that "[a]ll monies derived from license taxes levied under the provisions of this Code shall be paid to the City and placed to the credit of the General Fund of the City of Birmingham, and shall be used and expended as authorized by law and ordinance." Business License Code, art. II, § 17.

The City has also adopted an Occupational Tax Code (together with the Business License Code, "the City Codes") imposing a "license fee . . . upon any person who engages in or follows any trade, occupation, or profession within the City of Birmingham when the relationship between the

8

individual performing the services and the person for whom such services are rendered is the legal relationship of employer and employee." Birmingham, Ala. Occupational Tax Code, art. I, § 2(a) (2009), *available at* http://www.birminghamal.gov/?s=tax+code (follow "Occupational Tax Code" hyperlink). The cost of the occupational license fee is "one percent (1%) of the gross receipts" of each person subject to the Occupational Tax Code. Occupational Tax Code, art. I, § 5.1. It is the responsibility of the employer to withhold the occupational license fee from employees' wages and remit the same to the City. *Id.* Like the Business License Code, the Occupational Tax Code refers to the amounts to be collected as "license fees," "taxes," or "license taxes." The Occupational Tax Code also contains a provision similar to the one found in the Business License Code regarding use of the amounts collected; this provision provides "[a]ll monies derived from the occupational license fees levied under the provisions of this ordinance shall be paid to the City and placed to the credit of the General Fund of the City of Birmingham, and shall be used and expended as authorized by law and ordinance." Occupational License Code, art. I, § 17.

Although the Alabama Code characterizes the licensing of trades and occupations as a tax, as do the City Codes enacted pursuant to the authority given in Alabama Code Section 11-51-90, such characterization is not controlling. However, the obligations imposed, namely business licenses and occupational taxes, bear the characteristics of a tax. The business license and occupational tax charges imposed by the City Codes are placed in the City's General Fund to be used "as authorized by law and ordinance," indicating that the sums collected are revenue for the City, and not set aside to defray the costs of a specific service. The Court concludes that the business license and occupational taxes that the City has attempted to collect from Dr. Perry are in the nature of taxes, which may or may not be dischargeable, depending on whether the taxes fit the Bankruptcy Code's

9

Case 13-00023-TOM    Doc 65    Filed 10/30/14    Entered 10/30/14 15:43:24    Desc Main
Document      Page 9 of 18

criteria for nondischargeability.[6]

Section 523(a)(1) excepts certain taxes from a bankruptcy discharge. Subsection (A) excepts from discharge two categories of tax obligations that are also given priority status under the Bankruptcy Code. The first, found in Section 507(a)(3), applies only in involuntary cases.[7] The second, found in Section 507(a)(8), encompasses "allowed unsecured claims of governmental units" of certain kinds. The City asserts that the business license and occupational taxes at issue are excise taxes given priority under Section 507(a)(8)(E),[8] referenced in Section 523(a)(1)(A). The Bankruptcy Code does not define "excise tax." *Reorganized CF & I Fabricators*, 518 U.S. at 220, 116 S. Ct. at 2111. Black's Law Dictionary defines excise tax as "[a] tax imposed on the

---

[6] According to the City, with regard to occupational taxes, the only amounts now due from Dr. Perry are penalties. Penalties tied to nondischargeable taxes are also nondischargeable. *See McKay v. United States*, 9578 F.2d 689, 693 (9th Cir. 1992).

[7] Section 507(a)(3) itself refers to "unsecured claims allowed under section 502(f) of this title." In turn, Section 502(f) references claims filed in involuntary cases.

[8] Section 507(a)(8)(E) provides:

(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for--
. . .
    (E) an excise tax on--
        (i) a transaction occurring before the date of the
        filing of the petition for which a return, if required,
        is last due, under applicable law or under any
        extension, after three years before the date of the
        filing of the petition; or
        (ii) if a return is not required, a transaction
        occurring during the three years immediately
        preceding the date of the filing of the petition[.]

11 U.S.C. § 507(a)(8)(E).
During closing arguments counsel for the City agreed that the debt could be best characterized as an excise tax under Section 507(a)(8)(E).

10

performance of an act, the engaging in an occupation, or the enjoyment of a privilege. A tax on the manufacture, sale, or use of goods or on the carrying on of an occupation or activity, or a tax on the transfer of property." *Black's Law Dictionary* 563 (8th ed. 2004) (citations omitted). Several courts have adopted the Black's Law Dictionary definition. *See In re National Steel Corp.*, 321 B.R. 901, 908 (Bankr. N.D. Ill. 2005) (compiling cases).

The Supreme Court of Alabama has considered Alabama Code Section 11-51-90, the statute authorizing a municipality to require businesses to be licensed, as a statute imposing an excise tax. *Town of Mulga v. Town of Maytown*, 502 So. 2d 731, 732 (Ala. 1987) (noting that an ordinance, enacted pursuant to Alabama Code Section 11-51-90 and requiring a seller and distributor of gas to obtain a business license, imposed an excise tax); *Brown v. Board of Education*, 863 So. 2d 73, 86 (Ala. 2003) (noting that "occupational taxes are within the excise-tax category").

Dr. Perry was required by the City Codes to purchase a business license and to withhold and remit occupational taxes from the wages of her employees. These taxes were imposed as a result of Dr. Perry's operation of her medical practice and are excise taxes as that term has been defined in case law and has been used by the Alabama Supreme Court. The question remains, however, whether these excise taxes are the kind of excise tax contemplated by Section 507(a)(8)(E).

In support of her argument that the taxes have been discharged, Dr. Perry cites *Templar v. Shamokin Area School District (In re Templar)*, in which the court emphasized that Section 507(a)(8)(E) contemplates excise taxes based on a "transaction" and concluded that an occupational tax did not qualify. *Templar v. Shamokin Area School District (In re Templar)*, 170 B.R. 562, 563 (Bankr. M.D. Penn. 1994). While the court acknowledged that the occupational tax was an excise tax, it concluded that an "occupation" could not be a "transaction," and therefore the occupational

11

tax was not the type referenced in Section 507(a)(8)(E). *Id*. at 564. However, the court in *In re National Steel Corporation* drew a different conclusion. *In re National Steel Corp.*, 321 B.R. 901 (Bankr. N.D. Ill. 2005). In *National Steel*, the court was called upon to determine whether a franchise tax was "an excise tax 'on a transaction' as required under § 507(a)(8)(E)." *Id*. at 911. The court noted that the legislative history of Section 507 indicates that Congress intended a broad interpretation of "transaction,"[9] and further, that "[c]ourts have found that various activities constitute transactions in connection with excise taxes, including operating an automobile, driving a large truck on a public highway, or employing a worker." *Id*. at 911 - 12 (internal citations omitted). The court acknowledged *Templar* but declined to agree with the decision:

> With all due respect to the *Templar* court, this Court is confident that it is both reasonable and correct to conclude that the Texas franchise tax is an excise tax on a transaction or a series of transactions that are necessarily required in the carrying on of business. The *Templar* court failed to note or address this actuality, and, based on the Court's research, it is alone in its holding with respect to excise taxes on transactions. Instead, the Court is persuaded by the analyses of the courts that have broadly construed the term "transaction" and therefore finds that the franchise tax in the matter at bar is an excise tax on a transaction for purposes of § 507(a)(8)(E).

*National Steel*, 321 B.R. at 913. Both *Templar* and *National Steel* were decided by courts outside of the Eleventh Circuit, and it appears that the Eleventh Circuit Court of Appeals has not addressed

---

[9] According to legislative history:

Congress intended the term "transaction" to be defined broadly. The Joint Statement of the floor leaders, Senator DeConcini and Representative Edwards, stated that: "[a]ll Federal, State or local taxes generally considered or expressly treated as excises are covered by this category, including sales taxes, estate and gift taxes, gasoline and special fuel taxes, and wagering and truck taxes."

*National Steel*, 321 B.R. at 912 (*quoting Groetken v. State of Ill., Dep't of Revenue (In re Groetken)*, 843 F.2d 1007, 1014 (7th Cir.1988), in turn citing 124 Cong. Rec. 34,016 (Senate), reprinted in 1978 U.S.C.C.A.N. 6505, 6567; 124 Cong. Rec. 32,416 (House), reprinted in 1978 U.S.C.C.A.N. 5787, 6436, 6498 (emphasis added)).

12

the issue.

This Court agrees with the court's reasoning in *National Steel*. Dr. Perry's medical practice involved multiple transactions, from receiving payment for the care and treatment of her patients to employing and paying others to work for her in the practice. Legislative history indicates that Congress intended for "transaction" to be defined broadly, and this Court concludes that the unpaid business license and occupational taxes at issue in this case are excise taxes for purposes of Section 507(a)(8)(E). Because Section 523(a)(1)(A) excepts excise taxes from discharge, the taxes and penalties owed by Dr. Perry were not included in her Chapter 7 discharge.[10]

**II.  SANCTIONS**

Dr. Perry contends that the City should be sanctioned for attempting to collect a debt discharged in her bankruptcy case. Some of the actions complained of by Dr. Perry occurred before Dr. Perry received her discharge while others occurred after her discharge was entered; thus, the Court must consider whether the City violated either the automatic stay or the discharge injunction, or both.

To provide for orderly liquidation or reorganization the Bankruptcy Code stays, among other things, the commencement or continuation of an action against the debtor that could have been brought before the bankruptcy filing, or collection of a claim that arose before the bankruptcy filing; an act to obtain possession of estate property; or an act to create or enforce a lien against estate property. 11 U.S.C. § 362(a)(1), (3), (4). This automatic stay arises by operation of law at the

---

[10] Section 507(a)(8)(E) specifies taxes assessed within a certain time frame. Dr. Perry did not present testimony or evidence, and her counsel made no argument, regarding whether the taxes were assessed within the specified time frame. The Court thus declines to address an issue not raised by the plaintiff.

13

moment the bankruptcy petition is filed regardless of whether affected parties have notice of the filing. 11 U.S.C. § 362(a). *See e.g., Ford v. Loftin (In re Ford)*, 296 B.R. 537, 542 (Bankr. N.D. Ga. 2003). Pursuant to Section 362(c)(1), "the stay of an act against property of the estate . . . continues until such property is no longer property of the estate." Pursuant to Section 362(c)(2), the stay of other acts in Section 362(a) remains in effect until the earliest of three things: closing of the case, dismissal of the case, or grant or denial of a discharge. However, the stay does not apply to acts specified in Section 362(b), including certain acts relating to taxes:

> (b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay--
> . . .
>> (9) under subsection (a), of--
>> (A) an audit by a governmental unit to determine tax liability;
>> (B) the issuance to the debtor by a governmental unit of a notice of tax deficiency;
>> (C) a demand for tax returns; or
>> (D) the making of an assessment for any tax and issuance of a notice and demand for payment of such an assessment (but any tax lien that would otherwise attach to property of the estate by reason of such an assessment shall not take effect unless such tax is a debt of the debtor that will not be discharged in the case and such property or its proceeds are transferred out of the estate to, or otherwise revested in, the debtor).

11 U.S.C. § 362(b)(9).

In addition to the protections afforded by the automatic stay, the Bankruptcy Code provides protection for a debtor upon the debtor's receiving a discharge, which "operates as an injunction against . . . an act, to collect, recover or offset any such debt as a personal liability of the debtor . . . ." 11 U.S.C. § 524(a)(2). When a debtor receives a discharge, the discharge injunction replaces and operates similarly to the automatic stay. *See Matthews v. United States (In re Matthews)*, 184 B.R. 594, 599 (Bankr. S.D. Ala. 1995); *see also McCool v. Beneficial (In re McCool)*, 446 B.R. 819,

822 - 23 (Bankr. N.D. Ohio 2010).

In determining whether a to hold a creditor in contempt for violating either the automatic stay or the discharge injunction a court must first consider if the violation was willful. *Hardy v. United States (In re Hardy)*, 97 F.3d 1384, 1390 (11th Cir. 1996). It is not the creditor's subjective beliefs or intent that is important. Rather, the focus is on whether the creditor's conduct complied - or did not comply - with the pertinent order. *Id*. *See also Caffey v. Russell (In re Caffey)*, 384 B.R. 297, 307 (Bankr. S.D. Ala. 2008) ("There is no specific intent requirement for a "willful" violation . . . ."). The Eleventh Circuit has articulated a two-part test for determining whether a creditor willfully violated the automatic stay that is also applicable to determining whether a creditor willfully violated the discharge injunction. *Id*. *See also Jove*, 92 F.3d at 1555. A creditor's actions will be considered "willful" if the creditor "(1) knew that the automatic stay was invoked and (2) intended the actions which violated the stay." *Jove*, 92 F.3d at 1555 - 56. In other words a creditor acts willfully when it, with knowledge of a bankruptcy petition, acts deliberately in a manner that violates the stay, even if his actions are not intentionally meant to violate the stay. *Caffey*, 384 B.R. at 307; *see also In re Parker*, 279 B.R. 596, 603 (Bankr. S.D. Ala. 2002); *Spinner v. Cash In A Hurry, LLC (In re Spinner)*, 398 B.R. 84, 94 (Bankr. N.D. Ga. 2008) (Violation of the automatic stay is presumed deliberate if the creditor has actual notice of the bankruptcy.). Upon obtaining knowledge of the bankruptcy, the creditor bears the burden of not violating the automatic stay. *Caffey*, 384 B.R. at 307.

A creditor will not receive sufficient notice of a bankruptcy filing if the creditor's address is scheduled incorrectly. In *Brannon v. Chuck Stevens Automotive, Inc. (In re Brannon)*, AP No. 12–00114, 2013 WL 237759, at *2 (Bankr. S.D. Ala. Jan. 22, 2013), the debtor provided an incorrect

15

address for a creditor on her schedules. *Id*. According to the debtor's complaint, a managerial employee of the creditor confronted the debtor upon seeing her in a public place. *Id*. at *3. The debtor alleged that she informed the managerial employee of the bankruptcy filing and he acknowledged the same but continued to "harangue" her about the debt until she ran out of the building. *Id*. at *1, *3. After the debtor filed an adversary proceeding the creditor sought dismissal on the grounds that it did not receive formal notice of the bankruptcy filing. *Id*. Taking the debtor's allegations as true, the court concluded that the creditor had actual notice of the bankruptcy, which was sufficient to support a claim of violation of the stay. *Id*. at * 3.

## A. Automatic Stay

Ms. Walker testified that after the date of Dr. Perry's bankruptcy but prior to the date of discharge the City sent to her notices and correspondence, including a notice of preliminary assessment of tax liability, and attempted at least one visit to Dr. Perry's place of business. Although the City is not prohibited by the Bankruptcy Code from assessing taxes and taking certain actions, the City is not given free reign to make any collection attempts that it sees fit. The Court need not determine, however, whether the actions taken by the City prior to discharge were violations of the automatic stay because any actions the City took prior to discharge were not willful.

Dr. Perry's original schedules filed with her petition did not include the City. It was not until November 16, 2011, almost one month after the case was converted, that the schedules were amended to list the City. Even then, the City did not receive notice of the bankruptcy filing because Dr. Perry provided the wrong address for the City on her schedules. There is no evidence that the City received notices from the bankruptcy court, and no evidence that the City had actual knowledge of the bankruptcy until the phone call made by Dr. Perry's counsel in June 2012, after Dr. Perry's

16

Case 13-00023-TOM    Doc 65    Filed 10/30/14    Entered 10/30/14 15:43:24    Desc Main
Document      Page 16 of 18

discharge had been entered. The Court is somewhat concerned by the City's view that unless or until it receives "formal" notice of a bankruptcy from the Bankruptcy Court, it need not cease collection activities. The Court notes there is case law providing that once *any* notice is given to a creditor, the creditor has a duty to inquire into whether there has been a bankruptcy filing. *See Byrd v. Alton (In re Alton)*, 837 F.2d 457, 460 - 61 (11th Cir. 1988). The City, or any creditor who ignores even verbal notice of a bankruptcy filing does so at its peril. The Court finds that if the City violated the automatic stay, it did not do so willfully; thus, Dr. Perry is not entitled to any recovery for any stay violation that may have been committed.

## B. Discharge Injunction

The question remains whether the City violated the discharge injunction when it attempted to collect the debt after Dr. Perry received her discharge. Between February 27, 2012, the discharge date, and June 2012, when the call to the City was made by Dr. Perry's counsel, the City notified Dr. Perry of its final assessment of the business license and occupational tax due. After the call, and with actual notice of the bankruptcy, the City continued on with its collection efforts including sending correspondence again informing her that a lien would be placed on her property if she failed to pay the debt by a certain date and filing a state court action against her. Attempts to collect a debt that has been discharged in bankruptcy are violations of the discharge injunction. However, there is no violation if the debt has not been discharged, and in this case, Dr. Perry's debt owed to the City was not included in her discharge entered February 27, 2012. Therefore, the City did not violate the discharge injunction by attempting to collect the business license and occupational taxes owed by Dr. Perry.

## CONCLUSION

Dr. Perry contends that her debt to the City for unpaid city licenses was included when she received her Chapter 7 discharge, and that the City should be sanctioned for attempting to collect a discharged debt. However, the business license and occupational taxes at issue are excise taxes that are not dischargeable under the Bankruptcy Code. Because the City was not properly scheduled in Dr. Perry's bankruptcy case, any action taken to the City to collect the debt prior to discharge, if the action could be considered a violation of the automatic stay, was not a willful violation. Further, because the taxes were not discharged, any action taken by the City post-discharge was not a violation of the discharge injunction. Thus, Dr. Perry is not entitled to sanctions against the City. Accordingly, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that the relief sought by the Plaintiff, Dr. Maria Wellman Perry, for a declaration that the debt owed to the City of Birmingham for business license and occupational taxes was discharged in her bankruptcy case is **DENIED**. It is further

**ORDERED, ADJUDGED, AND DECREED** that the relief sought by the Plaintiff, Dr. Maria Wellman Perry, for sanctions for violation of the automatic stay and/or discharge injunction is **DENIED**.

Dated: October 30, 2014

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

TOM/dgm

xc: Maria Wellman Perry
    Oscar W. Adams, III
    Yolanda Y. Lawson Hunter
    Thomas E. Reynolds, Trustee